UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | |
|---|---|
| GENUS ARTIFICIAL INTELLIGENCE INC., <br><br> Plaintiff, <br><br> v. <br><br> AI ADVERTISING INC., <br><br> Defendant. | Case No. 5:23-cv-00732 |

# COMPLAINT

## NATURE OF THE ACTION

1. This dispute concerns two competitors in the market for technology platforms that provide marketing insights driven by artificial intelligence ("AI"). Plaintiff Genus Artificial Intelligence Inc. ("Genus") executed a contract with Defendant AiAdvertising Inc. ("AIA") to license its AI-driven marketing platform to AIA and to provide development services for a period of one year in exchange for a fixed fee of $300,000. Genus entered into this contractual relationship with AIA based on an explicit promise that AIA would engage in good faith negotiations regarding a broader transaction involving an investment in, or acquisition of, Genus. Genus also accepted a three-month no-shop period during which Genus would not solicit third parties to acquire a controlling stake in Genus and would not transfer or assign Genus's technology assets without AIA's written consent.

2. Within months of executing the contract and gaining access to Genus's proprietary technology, AIA defaulted on its obligation to pay the fixed fee. AIA's executives denied that amounts were due under the contract claiming that the contract was "cancelled," while AIA's

1

employees continued to use and benefit from use of Genus's platform and services. Moreover, AIA did not negotiate with Genus to consummate a broader transaction at all, making abundantly clear that the promise to negotiate in good faith was merely a pretext to gain access to Genus's confidential information. AIA's public statements regarding the capabilities of its own platform suggest that it has appropriated Genus's confidential information and is passing off Genus's technology as its own.

3. Accordingly, by way of this action, Genus seeks to recover the amounts due to it under the contract, and to sue AIA for damages resulting from theft of Genus's trade secrets under federal and state trade secret law.

**PARTIES**

4. Plaintiff Genus Artificial Intelligence Inc. is a technology company based in San Francisco, California. Genus's core offering is a technology platform that enables customers to evaluate advertising content and consumer audiences using artificial intelligence.

5. Defendant AiAdvertising Inc. is a technology company incorporated in Nevada, whose principal executive offices are in San Antonio, Texas. AIA offers a software solution that enables automation and predictive capabilities for marketing clients.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over the claim arising under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq., under 28 U.S.C. § 1331. This Court has subject-matter jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). This Court also has subject-matter jurisdiction over the state-law claims under 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount-in-controversy exceeds $75,000.

7. This Court has personal jurisdiction over Defendant AIA because AIA has significant contacts with Texas. AIA is a registered corporation in the State of Nevada, and its principal executive offices are in San Antonio, Texas. Venue is proper in this district because the Defendant's principal executive offices are located in this district.

**FACTUAL BACKGROUND**

8. In 2019, Plaintiff Genus launched an AI-based marketing platform that allows customers to create and evaluate image or video ads using AI in a cost-effective, time-efficient manner, thereby enabling those customers to confidently launch ads that convert audiences to paying customers. Genus was founded by Tadas Jucikas and Viktoras Jucikas in 2016. To date, Genus has raised over $10 million in funding from angel, venture capital, and institutional investors. Genus has doubled its revenue every year since 2021 and, today, Genus serves more than 30 paying customers and hundreds of trial customers in the United States, Europe, South America, Africa, and Asia.

  A. **Genus's Introduction to AIA**

9. In October 2021, Peter Holden of Dunworth Capital, who described himself as an advisor to AIA's board on technology matters, introduced Dr. Jucikas to representatives of AIA. The purpose of the introduction was to explore possible synergies between Genus and AIA, recognizing that Genus's technology is very advanced and could put AIA's growth on a different plane. Until that time, AIA had provided professional services to its customers, enabling them to design, build, and execute on digital marketing campaigns. Beginning in the fourth quarter of 2021, AIA pivoted to a software licensing model, selling a platform that enables automation and predictive capabilities for its marketing clients.

10. In November 2021, Genus and AIA agreed to work on a pilot project together to showcase Genus's capabilities and enhance AIA's offerings to an e-commerce brand for the parties' mutual benefit. The pilot project involved the AI-driven creation of video ads for AIA's customer using Genus's platform. At the same time, Mr. Holden represented to Dr. Jucikas that the parties would engage in parallel discussions on licensing Genus's platform to AIA and that, assuming the pilot project was successful, AIA would make a strategic investment in Genus. Genus was actively seeking investors at the time, so Dr. Jucikas proposed that AIA invest in Genus and execute license terms prior to embarking on the pilot project. But, because AIA's need for the pilot project was urgent, Genus agreed to collaborate with AIA pending execution of a formal agreement.

11. In January 2022, Genus once again collaborated with AIA to pitch AIA's customer in the financial services industry. Soon thereafter, Genus and AIA executed a Mutual Non-Disclosure Agreement to explore the terms of a potential acquisition and IP licenses to enable AIA's continuing use of Genus's platform. Because AIA was already using Genus's platform and associated proprietary data and rights, the parties entered into a Developer & Option Agreement on April 1, 2022 (the "Agreement"), attached as **Exhibit A**, while they engaged in negotiations over a broader transaction.[1] Genus also agreed to refrain from soliciting acquisition proposals from third parties and to refrain from transferring or assigning its technology assets for a three-month period while Genus and AIA engaged in negotiations regarding a potential transaction.

### B. The License Agreement and Option Period

12. Under the Agreement, Genus granted AIA a one-year license to use its AI-driven platform. In particular, Genus agreed to provide "the Genus.AI Full Stack Growth Enablement

---

[1] *See* Ex. A (Developer & Option Agreement, Mar. 31, 2022).

Platform and suite of software tools and all associated IP rights required for its use by AIA and integration onto its AIAD Platform." (Ex. A § 3.1.) In connection with the Development License, Genus agreed to provide Development Services to AIA, including access to Genus's platform, direct API-based access to Genus's creative scoring and audience generation solutions, and full integration of Genus's platform onto the AIA platform. (*Id.* § 3.4, TABLE 1.) Genus agreed to provide a "white-label" solution to AIA, i.e. allowing AIA to re-package and offer Genus's platform as their own brand, based on the explicitly promised prospect that the parties would explore a potential investment or acquisition by AIA. All intellectual property rights vesting in Genus as of April 1, 2022, were to remain vested in Genus, (*Id.* § 8.1), and AIA was obligated to refrain from disclosing or using in any manner whatsoever Genus's confidential information. (*Id.* §§ 2.4, 7.1.)

13.     In turn, AIA was required to "pay a $300,000 fixed-fee for Development License and Services payable over the Option Period granting AIA a one (1) year right ('License Term') use of the Genus.ai Platform suite . . . ." (*Id.* § 4.1.) The parties agreed to the following payment terms: the first installment of $100,000 payable "[a]t Closing on Effective Date," the second installment of $100,000 payable at "[e]nd of First Month Proceeding Effective Date," and the final instalment payable at "[e]nd of Second Month Proceeding Effective Date [] which conclude[s] at the end of the three-month exclusivity period." (*Id.* § 4.7.1.) AIA was required to make all payments on or no later than three working days from the receipt of a valid invoice from Genus. (*Id.* § 4.10.)

14.     Under the Agreement, the parties also entered into "an initial contractual arrangement for a period of three (3) months ('Option Period') during which time Parties agree[d] to negotiate in good faith on consummating a broader transaction, principally AIA acquiring

Genus.ai outright, taking a majority or minority stake in Genus.ai." (*Id.* § 1.2.) Relying on AIA's representations and intent to negotiate a broader transaction, Genus accepted a no-shop obligation during the Option Period, i.e., agreeing that it "shall not enter into discussions nor consummate outright sale or sale of a controlling stake in Genus.ai as well as transfer or assignment of Genus.ai assets and IP with a third party without AIA's expressed written consent in advance." (*Id.* § 1.8.) If the parties failed to consummate a broader transaction, AIA would be entitled to terminate the Agreement by providing written notice to Genus "without any liability whatsoever (save for the obligation to make payment of any fees which may be due to Genus.ai for the Development License and Development Services delivered under this Agreement)." (*Id.* § 1.4.)

### C. AIA Goes Cold After Genus Provides Access to Its Platform

15. After the Agreement was signed, Genus organized weekly calls with AIA's employees to train them regarding the use of Genus's platform and, by May 2022, Genus had onboarded almost ten of AIA's customers onto Genus's platform. By October 2022, AIA was delivering Genus's platform features to more than 25 of its customers.

16. In parallel, Genus attempted to negotiate the terms of a potential investment or acquisition by AIA of Genus. Pursuant to AIA's request, Genus gave AIA's agent, an entity called RevenueVP, access to Genus's data room. AIA represented at the time that RevenueVP would assist with AIA's go-to-market strategy, platform development, and the potential transaction. Representatives of AIA and RevenueVP accessed Genus's data room and obtained Genus's proprietary assets, including, but not limited to, intellectual property associated with Genus's platform; customer lists; customer contact information; information about customers' requirements, preferences, and inventory; revenue metrics; and information about Genus's sources of financing.

17. But, while Genus diligently engaged with AIA to advance integration of its platform with AIA's offering, AIA went cold on its obligations under the Agreement. After gaining access to Genus's data room under the pretext of conducting diligence, AIA did not negotiate with Genus in good faith regarding the terms of a potential transaction.

18. Moreover, AIA inexcusably failed to comply with its obligation to pay the $300,000 fixed fee under the Agreement. Despite being required to make payments within 3 days of an invoice being issued, AIA took more than 2 weeks to make its payment against the first invoice. And, despite taking advantage of Genus's platform and proprietary assets for months, AIA has inexcusably failed to make any payments against the second and third invoices, which were issued by Genus on May 9, 2022, and July 7, 2022. When Genus issued the third invoice, AIA's Chief Financial Officer inexplicably claimed that AIA had *canceled* Genus's services in May.

19. Pursuant to the Agreement, AIA's obligation to make the fixed-fee payments are not contingent on Genus's continuing provision of services, consummation of a transaction, or any other event. Accordingly, on multiple occasions between May 2022 and September 2022, Genus attempted to follow up with AIA's representatives regarding their failure to comply with, and flawed understanding of, the terms of the Agreement. Despite Genus's repeated attempts at outreach – by email, phone, and voicemail – AIA failed to fulfil its obligations under the Agreement.

### D. Genus Terminates Its Relationship With AIA

20. In the meantime, AIA continued to benefit from its use of Genus's platform and services. Despite claiming that Genus's services were cancelled in May, more than twenty-five of AIA's customers were availing services on Genus's platform as of October 2022. In September 2022, AIA signed a contract to provide services to a fintech customer, including services enabled

by Genus's proprietary technology, which was AIA's largest contract at the time. Indeed, on October 3, 2022—after AIA's CFO claimed that Genus's services had been "canceled"—AIA's employees requested Genus to create seven additional accounts on Genus's platform for AIA's customers. Adding to Genus's concern were statements made by AIA on social media which suggested that AIA was passing off Genus's technology as its own and using Genus's confidential information for its own personal gain:



21. At this stage, it became apparent to Genus that AIA had no intention of executing a broader transaction with Genus. Perturbed by AIA's public statements and their executives' failure to respond or even acknowledge AIA's non-payment of amounts due under the Agreement, on October 11, 2022, Genus notified AIA of its intent to suspend the Development License and Development Services. Through a letter delivered by Genus's outside counsel, AIA was notified that its access to the Genus platform would be terminated and its customers' data would be deleted unless AIA paid the outstanding $200,000 due under the Agreement and provide written assurances that AIA is not using Genus's confidential information by October 18, 2022. Consistent with its course of conduct, AIA failed to respond to Genus's request for more than two weeks. Accordingly, on October 31, 2022, Genus proceeded to terminate the Development License and Development Services as a result of AIA's breach of the Agreement and failure to pay significant outstanding fees under the Agreement.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Breach of Contract - Delaware Law)

22. The above paragraphs are realleged as if fully set forth herein.

23. Pursuant to the Agreement, AIA was obligated to negotiate with Genus in good faith on consummating a broader transaction that involved an investment in, or outright acquisition of, Genus. Notwithstanding the outcome of those negotiations, AIA was required to pay a fixed fee of $300,000 for gaining access to and using Genus's platform and related proprietary assets. Further, under the terms of the Agreement and the Non-Disclosure Agreement executed in January 2022, AIA is barred from disclosing or using in any manner whatsoever Genus's confidential information, including, but not limited to, Genus's intellectual property rights, proprietary assets,

and any information relating to Genus's business or operations that were obtained during the course of negotiations. The Agreement provides that it "will in all respects be governed by and construed under the laws of the State of Delaware." (Ex. A § 9.1.)

24. Genus has performed all of its obligations under the relevant agreements. Any conditions precedent have been satisfied.

25. AIA breached each of the foregoing contractual obligations relating to payment of the fixed-fee, use of confidential information, and requirement to negotiate in good faith regarding a broader transaction. Having lured Genus into providing access to its platform and proprietary assets, AIA withheld payments that are due to Genus and, instead, is passing off Genus's technology as its own and using Genus's confidential information for its own personal gain.

26. Genus has sustained, and will continue to sustain, damages as a result of AIA's contractual breaches.

27. Genus has sustained, and will continue to sustain, irreparable harm as a result of AIA's contractual breaches.

## COUNT TWO

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

28. The above paragraphs are realleged as if fully set forth herein.

29. Like all contracts, the Agreement included an implied covenant of good faith and fair dealing between the parties.

30. Defendant AIA breached the implied covenant by, among other things, refusing to honor its obligation to pay amounts due under the Agreement, by failing to negotiate in good faith regarding the terms of a broader transaction, and by passing off Genus's technology as its own and using Genus's confidential information for its own personal gain.

## COUNT THREE

### (Fraudulent Inducement)

31. The above paragraphs are realleged as if fully set forth herein.

32. Defendant AIA was aware that the Development License and Development Services under the Agreement involved sharing of Genus's confidential and proprietary information, including, but not limited to, intellectual property and other proprietary assets underlying Genus's platform; customer lists; customer contact information; information about customers' requirements, preferences, and inventory; revenue metrics; and information about Genus's sources of financing. AIA was also aware that Genus was looking for potential investors when AIA proposed a no-shop period in the Agreement during which Genus and AIA could negotiate the terms of a broader transaction.

33. AIA knowingly or recklessly misrepresented their intent to negotiate the terms of a broader transaction with Genus.

34. AIA hoped and intended that Genus would rely on these misrepresentations.

35. Genus reasonably did rely on AIA's misrepresentations regarding their intent to negotiate the terms of a broader transaction with Genus.

36. Genus's reasonable reliance was the key factor in causing Genus to enter into the Agreement for the provision of Development License and Development Services to AIA, including the sharing of Genus's confidential and proprietary information.

## COUNT FOUR

### (Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)

37. The above paragraphs are realleged as if fully set forth herein.

38. Plaintiff and Defendant are engaged in interstate and international commerce in connection with their business of providing AI-driven marketing platforms and insights.

39. Genus's confidential and proprietary information includes (but is not limited to) intellectual property and other proprietary assets underlying Genus's platform; customer lists; customer contact information; information about customers' requirements, preferences, and inventory; revenue metrics; and information about Genus's sources of financing.

40. Each category of Genus's proprietary and confidential information is a trade secret within the meaning of 18 U.S.C. § 1839(3).

41. Genus derives economic value and competitive advantage from this information not being known or used by its competitors or others.

42. Genus has taken appropriate steps to ensure the confidentiality of this information, including state-of-the-art information-security measures, such as password protection and limitations on the use of non-approved applications and programs to access the information; physical restrictions on access to Genus's offices; technological restrictions on how employees may access this information; and executing a non-disclosure agreement with the Defendant.

43. Defendant is misappropriating Genus's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

44. Defendant is using, or intends to use, Genus's misappropriated trade secrets to gain a competitive advantage against Genus and other market participants. In breach of the Non-Disclosure Agreement signed in January 2022 and the Agreement signed on April 1, 2022, AIA is passing off Genus's platform and proprietary assets as its own to customers.

45. Genus has sustained, and will continue to sustain, damages as a result of AIA's misappropriation and use of its trade secrets.

46. Genus has sustained, and will continue to sustain, irreparable harm as a result of AIA's misappropriation and use of its trade secrets.

47. AIA has been unjustly enriched by their misappropriation and use of Genus's trade secrets.

48. Because AIA's misappropriation was willful and malicious, Genus is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

## COUNT FIVE

**(Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE §§ 134A et seq.)**

49. The above paragraphs are realleged as if fully set forth herein.

50. Plaintiff and Defendant are engaged in interstate and international commerce in connection with their business of providing AI-driven marketing platforms and insights.

51. Genus's confidential and proprietary information includes (but is not limited to) intellectual property and other proprietary assets underlying Genus's platform; customer lists; customer contact information; information about customers' requirements, preferences, and inventory; revenue metrics; and information about Genus's sources of financing.

52. Each category of Genus's proprietary and confidential information is a trade secret within the meaning of TEX. CIV. PRAC. & REM. CODE § 134A.002(6).

53. Genus derives economic value and competitive advantage from this information not being known or used by its competitors or others.

54. Genus has taken appropriate steps to ensure the confidentiality of this information, including state-of-the-art information-security measures, such as password protection and limitations on the use of non-approved applications and programs to access the information;

physical restrictions on access to Genus's offices; technological restrictions on how employees may access this information; and executing a non-disclosure agreement with the Defendant.

55. Defendant is misappropriating Genus's trade secrets in violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE §§ 134A et seq.

56. Defendant is using, or intends to use, Genus's misappropriated trade secrets to gain a competitive advantage against Genus and other market participants. In breach of the Non-Disclosure Agreement signed in January 2022 and the Agreement signed on April 1, 2022, AIA is passing off Genus's platform and proprietary assets as its own to customers.

57. Genus has sustained, and will continue to sustain, damages as a result of AIA's misappropriation and use of its trade secrets.

58. Genus has sustained, and will continue to sustain, irreparable harm as a result of AIA's misappropriation and use of its trade secrets.

59. AIA has been unjustly enriched by their misappropriation and use of Genus's trade secrets.

60. Because AIA's misappropriation was willful and malicious, Genus is entitled to exemplary damages and attorney's fees under TEX. CIV. PRAC. & REM. CODE §§ 134A.004(b) and 134A.005(3).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests entry of judgment in their favor and against Defendant. Plaintiff seeks the following measures of relief:

A. A preliminary and permanent injunction:

1. Prohibiting AIA from using, disclosing, disseminating, distributing, or discussing Genus's trade secrets or confidential information;

        2.      Directing AIA to destroy all copies of Genus's trade secrets or confidential information in its possession, custody, or control and any information derived, directly or indirectly, from Genus's trade secrets or confidential information, including by purging such information from its databases, records, files, computers, and other media and data storage sources;

        3.      Directing AIA to provide certification, under oath, that it has destroyed all copies of Genus's trade secrets or confidential information in its possession, custody, or control within six (6) weeks of being ordered to do so;

        4.      Prohibiting any of AIA's officers, agents, servants, employees, and attorneys, or any persons or entities who are in active concert or participation with AIA or any of AIA's officers, agents, servants, employees, and attorneys, from using, disclosing, disseminating, distributing, or discussing Genus's trade secrets or confidential information; and

        5.      Directing any of AIA's officers, agents, servants, employees, and attorneys, or any persons or entities who are in active concert or participation with AIA or any of AIA's officers, agents, servants, employees, and attorneys, from using, disclosing, disseminating, distributing, or discussing Genus's trade secrets or confidential information;

    B.      Statutory, compensatory, exemplary, and punitive damages, in an amount to be proven at trial, caused by Defendant's violations of Delaware common law, Defend Trade Secrets Act, and the Texas Uniform Trade Secrets Act;

    C.      Attorneys' fees and costs associated with prosecuting this action;

    D.      Prejudgment and post-judgment interest;

    E.      A declaration that Defendant is liable for all past and future costs and damages caused by the actions alleged herein; and

F.     Such other or additional relief as this Court deems just and proper under the circumstances.

Dated:  June 8, 2023.

Respectfully submitted,

By: */s/ Michael D. Marin*
     Michael D. Marin

Marc R. Lewis * (*Pro Hac Forthcoming*)
mlewis@lewisllewellyn.com
Nitesh Daryanani * (*Pro Hac Forthcoming*)
ndaryanani@lewisllewellyn.com
**LEWIS & LLEWELLYN LLP**
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 800-0590
Facsimile:  (415) 390-2127

and

Michael D. Marin
State Bar No. 00791174
**BOULETTE GOLDEN & MARIN L.L.P.**
2700 Via Fortuna, Suite 250
Austin, Texas 78746
Telephone: (512) 732-8924
Fax:          (512) 732-8905
mmarin@boulettegolden.com

ATTORNEYS FOR PLAINTIFF